**United States District Court**
For the Northern District of California

1
2
3
4
5                          UNITED STATES DISTRICT COURT
6                          NORTHERN DISTRICT OF CALIFORNIA
7
8  TRUSTEES OF THE ILWU-PMA PENSION          Case No. C-08-03136 JCS
   PLAN,
9                                            **REPORT AND RECOMMENDATION RE:**
                    Plaintiffs,
10          v.                               **1)  MOTION FOR SUMMARY
                                             JUDGMENT, OR IN THE ALTERNATIVE,
11 EMELDA PETERS, ET AL.,                    FOR SUMMARY ADJUDICATION OF
                                             CLAIMS (PARTIAL SUMMARY
12                  Defendants.              JUDGMENT) BY DEFENDANT AND
                                             CROSS-DEFENDANT DOROTHY
13 _____      ETHERIDGE [Docket No. 30];**

14 EMELDA PETERS,                            **2)  APPLICATION FOR DEFAULT
                                             JUDGMENT BY COURT AGAINST
15                  Cross-Claimant,          DEFENDANTS ROSE PETERS [Docket No.
                                             65];**
16          v.
                                             **3) APPLICATION FOR DEFAULT
17 DOROTHY ETHERIDGE,                        JUDGMENT BY COURT AGAINST
                                             DEFENDANT JOYCE CHAPMAN [Docket
18                  Cross-Defendant.         No.  67]**
   _____/
19

20 **I.      INTRODUCTION**

21         Plaintiffs, the trustees of the ILWU-PMA Pension Plan ("Trustees"), brought this

22 interpleader action under Section 502(a)(3) of the Employee Retirement Income Security Act

23 ("ERISA"), 29 U.S.C. § 1132(a)(3), seeking a determination as to whom the survivor pension

24 benefits payable on the account of William J. Peters are to be paid.  Plaintiffs named Dorothy

25 Etheridge ("Dorothy"), Emelda Peters ("Emelda"), Joyce Peters ("Joyce"), and Rose Peters ("Rose")

26 as defendants.  Dorothy and Emelda have appeared in this action, and Emelda has asserted cross-

27 claims against Dorothy.  Joyce and Rose have not appeared and the Clerk has entered their defaults

28 pursuant to Rule 55(a) of the Federal Rules of Civil Procedure.

United States District Court

For the Northern District of California

Presently before the Court are three motions.  First, Dorothy brings a summary judgment motion ("the Summary Judgment Motion") asking for a determination that she is, as a matter of law, entitled to receive the survivor pension benefits in the interpleader action.  She further requests that the Court enter judgment in her favor on all of Emelda's claims against her.  Second, the Trustees have filed an Application for Default Judgment by Court Against Defendant Rose Peters.  Third, the Trustees have filed an Application for Default Judgment Against Defendant Joyce Chapman.  All of the parties except Rose Peters have consented to the jurisdiction of a United States magistrate judge pursuant to 28 U.S.C. § 636(c).  The Court concludes that any relief afforded in the interpleader action will affect the legal rights not only of those who have consented but also of  the non-consenting defendant and therefore, that it does not have jurisdiction to decide the substantive issues of the interpleader action.  *See American Bankers Life Assur. Co. of Florida, Inc. v. Petty*,  2008 WL 3112066 (D.Virgin Islands, 2008) (finding that magistrate judge did not have authority to issue order to disburse funds in interpleader action where all named defendants had not consented to magistrate jurisdiction and noting that 28 U.S.C. § 636(b)(1)(A) does not authorize magistrate judges to decide interpleader claims).  Accordingly, the Court refers all three motions, along with recommendations on the motions, to a district court judge for determination.

For the reasons stated below, it is recommended that all three motions be GRANTED.[1]

## II.      BACKGROUND

### A.      Facts

#### 1.      Decedent's Work History and Plan Participation

Decedent William J. Peters ("William") was a longshore worker from 1967 until his retirement, on October 1,  2002.  Complaint, ¶¶ 11-13; Joint Statement of Undisputed Facts, No. 7. He participated in the ILWU-PMA Pension Plan ("the Plan"), a multi-employer benefit pension plan

---

[1]Dorothy filed objections to certain evidence offered by Emelda in support of her Opposition. *See* Docket No. 56.  With one exception, discussed below, the evidence cited, even if admissible, does not change the Court's result; therefore, the Court does not make any recommendation as to those objections, upon which it need not rule.

under ERISA sponsored by the International Longshore and Warehouse Union ("ILWU") and the Pacific Maritime Association ("PMA") for the benefit of longshore workers jointly registered by the ILWU and the PMA as part of the workforce in the longshore industry on the Pacific Coast of the United States. *Id.*, ¶ 11. William died on July 23, 2007. Joint Statement of Undisputed Facts, No. 11.

Under the terms of the Plan, William's surviving spouse is entitled to survivor pension benefits. For the purpose of determining who should receive these benefits, the Plan defines "surviving spouse" as follows:

1.35. "Surviving Spouse" – Subject to the provisions of any Qualified Domestic Relations Order to the extent it requires any other person to be treated as a Surviving Spouse, (a) any person who survives a Participant who was alive and whose Pension Commencement Date had not occurred as of June 30, 1987 if (i) such person was legally married to the Participant for a continuous period of not less than 1 year as of the Participant's Pension Commencement Date, (ii) such person legally married the Participant within 1 year before his Pension Commencement Date and was legally married to him for a continuous period of at least 1 year ending on or before the date of his death, or (iii) such person was legally married to the Participant for a continuous period of not less than 1 year as of his death, and his death occurred before his Pension Commencement Date; provided, if no other person satisfies the requirements of subparagraphs (a)(I) or (a)(ii), then any such person who was legally married to the Participant for a continuous period of not less than 1 year as of his death, where such Participant's Pension Commencement Date was on or before June 30, 1989, shall be treated as his Surviving Spouse; (b) any person (i) who survives a Participant who was alive and had not retired on July 1, 1976, and whose death (in the case of a Participant who has not retired) or Pension Commencement Date was prior to July 1, 1987, and (ii) who was legally married to such Participant for a period of not less than 1 year that ended with the day of his death which is on or subsequent to July 1, 1976; c) any spouse who, as of July 1, 1976, is eligible to receive a Survivor Pension and who, subject to the provisions of subparagraph (e) hereinbelow, does not at any time remarry; (d) a person (I) who survives a Participant who retired under the Pension Plan prior to July 1, 1976, (ii) who was dependent upon such Participant and was sharing such Participant's domicile as of his death, (iii) who shared a common domicile with, and was dependent upon, such Participant for the 3 years immediately preceding his death as though he and she were husband and wife, irrespective of the legal relationship existing between them, and (iv) who, subject to the provisions of subparagraph (e) hereinbelow, does not at any time remarry; (e) provided, for purposes of subparagraphs (c) and (d), a person whose status as a Surviving Spouse was terminated as the consequence of a remarriage may not requalify as a Surviving Spouse upon termination of such remarriage unless the Trustees, in their sole, absolute, and unreviewable discretion, are satisfied that the remarriage was annulled following the initiation of proceedings that were commenced for reasons other than reestablishing such person's status as a Surviving Spouse; and (f) any person who survives Participant who was alive on July 1, 1976, and had not retired and who dies prior to July 1, 1980, if such person satisfies on the date of such Participant's death the requirements of subparagraph (d)(ii) and (d)(iii) hereinabove, and if no other person satisfies all the requirements of subparagraph (b) hereinabove.

United States District Court

For the Northern District of California

Declaration of Kate McClure in Support of the Statement of the Trustees of the ILWU-PMA Pension Plan Regarding Whether Defendant Emelda Peters Qualifies as a Surviving Spouse Under Paragraph 1.35(c) of the Pension Plan ("McClure Decl."), Ex. A (Seventeenth Amendment to ILWU-PMA Pension Agreement as Amended through the Twenty-Ninth Amendment, dated March 27, 2003) ("the Plan"); Joint Statement of Undisputed Facts, No. 14. Emelda and Dorothy both contend that they are entitled to the Plan's survivor benefits.

The Summary Plan Description explains that the "definition of a Surviving Spouse was changed effective July 1, 1976 to comply with the requirements of [ERISA], and changed again effective July 1, 1987 to comply with the requirements of the Retirement Equity Act (REA)." McClure Decl., Ex. B (Summary Plan Description) at 66. Thus, it explains, the applicable definition depends on the date the participant retired and/or died, as follows:

> The Pre-July 1, 1976 Definition applies in the case of Pensioners who retired and active Participants who died before July 1, 1976. The July 1, 1976 through June 30, 1987 Definition applies in the case of Pensioners who retired and active Participants who died on and after July 1, 1976 and before July 1, 1987. The July 1, 1987 and After Definition applies in the case of Pensioners who retire and active Participants who die on and after July 1, 1987.

*Id*. at 66-67.

### 2.   William's Marital History

William married Rose McLin ("Rose") in San Francisco, California on July 30, 1967. Declaration of Crisostomo G. Ibarra in Support of Defendant and Cross-Defendant Dorothy Etheridge's Motion for Summary Judgment, or in the Alternative, for Summary Adjudication (Partial Summary Judgment) ("Ibarra Decl."), Ex. A (Certificate of Registry of Marriage); Joint Statement of Undisputed Facts, No. 1. According to a Petition for Dissolution of Marriage filed by William in February 1993 ("the 1993 Petition"), he and Rose separated on June 1, 1968. *Id*., Ex. B (Petition for Dissolution of Marriage, filed February 26, 1993). A judgment of dissolution of William's marriage with Rose was entered on March 31, 1994. *Id*., Ex. C (Judgment).

In the meantime, William entered into a relationship with Emelda Johnson ("Emelda"). According to Emelda, the relationship began in the 1960s. Cross-Complaint, ¶ 6. Emelda and

William had a son, Sean Peters, who was born December 25, 1967. *Id.*, Ex. F (ILWU/PMA Benefit Funds Record Change Form). William and Emelda were married in the State of Nevada on June 28, 1975 (while William was still married to Rose). *Id.*, Ex. D (Marriage Certificate). According to a Petition for Dissolution of Marriage filed by William in October 1994 ("the 1994 Petition"), he and Emelda separated in August 1979. *Id.*, Ex. H (Petition for Dissolution of Marriage, filed October 13, 1994). However, no judgment was entered on the petition. *See* Declaration of Murlene J. Randle in Support of Defendant and Cross-Claimant Emelda Peters' Opposition to Defendant and Cross-Defendant Dorothy Etheridge's Motion for Summary Judgment, or in the Alternative, for Summary Adjudication of Claims (Partial Summary Judgment) ("Randle Decl."), Ex. 8.

According to Emelda, the reason no judgment was entered in the marriage dissolution proceeding was that when she was served with the divorce petition, in 1994, she and William talked and decided they wanted to continue their marriage. Declaration of Defendant and Cross-Claimant Emelda Peters in Support of [her] Opposition to Defendant and Cross-Defendant Dorothy Etheridge's Motion for Summary Judgment, or in the Alternative, for Summary Adjudication of Claims ("Emelda Decl."), ¶ 32. Similarly, Emelda states that in 1997, when she received a letter from William's lawyer stating that William was ready to "conclude" the dissolution of their marriage, she and William again discussed the question and decided to continue their marriage. *Id.*, ¶ 34.

In 1983, Emelda moved to Louisiana to care for her parents. *Id.*, ¶ 14. She states that she and William agreed that he would remain in San Francisco but that they would continue their marital relationship. *Id.*, ¶ 15-16. Emelda states that she and William communicated by "telephone, cards . . . and letters," that William consistently acknowledged special occasions and holidays with gifts of money to Emelda and that she traveled to the San Francisco Bay area "as time permitted" and William traveled to Louisiana "from time to time." *Id.*, ¶¶ 15-16, 19, 23, 27. She also states that she and William purchased a car for her in 1997 and that William was a "major provider of financial support" for her and her family. *Id.,* ¶¶ 29, 37. According to Emelda, twice when she called

United States District Court

For the Northern District of California

1    William from Louisiana, the phone was answered by a woman. *Id.*, 20. Emelda states that she

2    asked William about the woman and he said that her name was Dorothy and that she was a friend

3    with health problems to whom he was lending a helping hand. *Id.*, ¶¶ 20-21.

4         According to Dorothy Etheridge ("Dorothy"), she met William in November 1990 in

5    Oakland, while on vacation from Chicago. Declaration of Defendant and Cross-Defendant Dorothy

6    Etheridge in Support of Her Motion for Summary Judgment, or in the Alternative, for Summary

7    Adjudication (Partial Summary Judgment) ("Etheridge Decl."), ¶ 2. Dorothy moved to California in

8    December 1991 and lived with William and his mother at his mother's house in San Francisco. *Id.*

9    In November 1992, Dorothy and William moved to their own place, in San Leandro, California. *Id.*

10        Dorothy and William married on July 15, 1994. *Id.*, ¶ 5 & Ex. A (License and Certificate of

11   Marriage). Dorothy states that prior to her marriage to William, he told her that he had been married

12   to a girl named "Rose" and that he needed to get a divorce from her. *Id.*, ¶ 3. Dorothy further states

13   that she and William waited to get married until William's divorce from Rose was finalized, on

14   March 31, 1994 (discussed above), and that William showed her a copy of the divorce decree before

15   they were married. *Id.*, ¶ 5. According to Dorothy, William told her that he had dated – but not

16   married – a woman named "Emelda," living in New Orleans, with whom he had had a son; a woman

17   named "Theresa," from San Francisco, with whom he had had a daughter; and a woman named

18   "Joyce." [2] *Id.*, ¶ 3. Dorothy further states that Willliam told her he separated from Emelda in 1979,

19   when Emelda discovered that William had had a daughter with Theresa during the time he was still

20   involved with Emelda. *Id.*, ¶ 4.

21        According to Dorothy, she was not aware that Emelda and William were married until

22   sometime after August 2007, when the dispute concerning William's surviving spouse benefits

23   _____

24        [2]In the motion papers, it is stated that "Dorothy is informed that William married Joyce (Fua)
     Peters ("Joyce") on or about July 13, 1984 in the State of California while still married to Rose. . . .

25   Dorothy is informed and believes that William and Joyce separated sometime in December 1988."
     Motion at 2. The Etheridge Declaration, however, contains no reference to a marriage between William

26   and Joyce. Nor has the Court found any evidence in the record to support this contention. Rather, a
     Record Change Form filed with the Plan adding Joyce as a beneficiary in 1986 designates her as "other"

27   rather than "wife" and bears the notation "not related." *See* Ibarra Decl., Ex. L.

28                                            6

arose. *Id.*, ¶ 6. Dorothy states that she spoke with Emelda twice on the telephone, however. *Id.*, ¶ 7. In 1996, Emelda called looking for William; she introduced herself to Dorothy and asked if she could call to keep William informed about his son and grandchildren. *Id.* Emelda called a second time, "several years later," to inform William that their son was getting married. *Id.* Dorothy also found a letter from Emelda to William dated May 29, 1997. *Id.*, Ex. B. The letter began, "[p]lease please do not have a heart attack nor stroke when you receive this letter, this is not a dear John nor is it a kissee kissee smile." *Id.* In the letter, Emelda wrote, "[t]he last time we talked you told me you are single again." *Id.*

According to Dorothy, William went on only one trip on his own during their marriage, to attend his son's wedding in New Orleans in either 2000 or 2001. *Id.*, ¶ 9. Dorothy states that after William returned from that trip, he was "not the same person anymore." *Id.* She states further that William told her in January 2002 that he was going to retire soon and move to New Orleans. *Id.*, ¶ 11. Dorothy and William separated on July 30, 2002. *Id.*, ¶ 12. Dorothy states that they had an "amicable divorce" and "agreed to split everything in half, including [their] respective pension benefits." *Id.* Both Dorothy and William retained their own counsel. *Id.*

The Marital Settlement Agreement between William and Dorothy included the following provision relating to William's ILWU-PMA pension benefits:

> The parties agree that there is a community interest in Husband's ILWU-PMA Benefit Plan. The Plan was joined as a claimant to the proceedings in August, 2002. The parties agree that the community interest in this account shall be divided by means of a [Qualified Domestic Relations Order] prepared by Eric J. Moon & Associates. Each party shall pay one half of Mr. Moon's fee within thirty days of Entry of Judgment for Dissolution and fully cooperate with the preparation of the [Qualified Domestic Relations Order]. Each party shall be entitled to receive one half of the community interest in said benefits payable as allowed by law under the terms of the plan. Husband's separate property benefits in this plan are confirmed to him as his separate property.

*Id.*, Ex. C (Marital Settlement Agreement) at 5.

The judgment for dissolution of William and Dorothy's marriage was entered on February 13, 2005. On March 23, 2006, the Alameda County Superior Court entered the Stipulation for

**United States District Court**
For the Northern District of California

Division of Pension Benefits and Qualified Domestic Relations Order. *Id.*, Ex. E. The Qualified

Domestic Relations Order ("QDRO") contains the following provisions:

> 1.      Respondent ["Participant"] has earned certain benefits under the ILWU-PMA Pension Plan [the "Plan"] which are the community property of Petitioner ["Alternate Payee"] and Participant. Participant and Alternate Payee intend herein to divide and allocate their community property interest in the Plan.
>
> 2.      Alternate Payee is the former spouse of Participant. The date of marriage was July 15, 1994 and the date of seperation was July 30, 2002.
>
> 3.      The community property interest of Participant and Alternate Payee in the Plan shall be determined by multiplying Participant's Plan benefit by a fraction, the numerator of which shall be the Participant's Paid Qualifying Years of Service attributable to the period between the date of marriage and the date of separation, and the denominator of which shall be the Participant's total Paid Qualifying Years of Service. Alternate Payee's portion shall be 50% of the total community property interest.
>
> 4.      Benefit payments to Alternate Payee shall commence on the first of the month following timely receipt by the Plan Office of a copy of the entered Order.
>
> 5.      Payment of Alternate Payee's portion of Participant's Plan benefits shall cease upon the death of Participant or Alternate Payee, whichever occurs first, except insofar as survivor benefits are payable to Alternate Payee.
>
> 6.      If Alternate Payee survives Participant, then Alternate Payee shall be treated by the Plan as a "surviving spouse" of Participant for purposes of any survivor annuity payable to a surviving spouse under the Plan, to the extent of the entire community property interest, as determined in paragraph 3 above. If Alternate Payee should become the only surviving spouse, she shall receive the survivor annuity in its entirety.

*Id.* at 2.

On October 1, 2002, William retired. Joint Statement of Undisputed Facts, ¶ 7. At that time, he moved to Louisiana to live with Emelda. Emelda Decl., ¶¶ 42-43. William and Emelda purchased a home together in 2005 and renewed their marriage vows on March 1, 2007. *Id.*, ¶¶ 44-45 & Ex. 11 (marriage certificate). Emelda states that she was not aware of William's marriage to Dorothy until 2006, when a copy of the QDRO was delivered to her home. *Id.*, ¶ 48. According to Emelda, at that time, William told her that he had entered into the agreement to split everything with Dorothy because "Dorothy was threatening to report him to the police as a bigamist, as [Dorothy] was aware that [William] had been married to another woman when he married [Emelda]." *Id.*, ¶

United States District Court

For the Northern District of California

48.[3]  Emelda states that William "then told [her] about his previous marriage with Rose and his subsequent marriage to Dorothy.  He went on to tell [her] that he met Dorothy during the time that [Emelda] was residing in Louisiana without him, and that [Dorothy] had been introduced to [William] by [Emelda's] aunt, his mother's best friend, Ms. Nazaree Foster."  *Id*.  According to Emelda, from the time of their marriage in 1975 to William's death, she was always William's wife and the two were never "separated," despite "ups and downs."  *Id*., ¶¶ 40-41, 46, 57-58.

Beginning in April 2006, Dorothy received a payment of $485.00/month under the Plan, representing her community property share of William's Pension.  *See* Etheridge Decl., Ex. G (April 28, 2006 letter from Plan representative to Etheridge).  These payments began after the Plan administrators reviewed the QDRO and found it to be valid.  *Id*.  The amount was calculated pursuant to the formula contained in Paragraph 3 of the QDRO (quoted above).  Accordingly, the Plan administrators calculated Dorothy's share as follows:  "William Peters' monthly pension benefit of $4,200.00 x 50% x 97 (months of community) divided by 420 (total benefit months) = $485.00 per month."  *Id*.

### B.    Procedural Background

On August 19, 2007, following William's death, Emelda filed a claim for survivor pension benefits as William's surviving spouse under the Plan.  Randle Decl., Ex. 16.  On August 27, 2007, Dorothy filed a claim under the Plan for survivor pension benefits stating that she was entitled to 100% of the survivor pension pursuant to the stipulation and QDRO.  *Id*., Ex. 17.  On June 30, 2008, the Trustees filed this interpleader action under Rule 22 of the Federal Rules of Civil Procedure and ERISA, seeking a determination as to the proper recipient of William's survivor pension benefits.  The Trustees named as defendants Emelda Peters, Dorothy Etheridge, Rose Peters and Joyce Peters.  Only Emelda and Dorothy filed answers.

---

[3]Dorothy objects to this statement on the ground that it is inadmissible hearsay.  *See* Docket No. 56.  The Court agrees.  For reasons that will be discussed below, the objection is sustained.

Emelda filed a cross-complaint against Dorothy on November 24, 2008, asserting the following claims:  1) conversion, based on Dorothy's receipt of the community property share of William's pension between March 23, 2006 and July 23, 2007; 2) trespass to chattels, based on the same pension payments; 3) unjust enrichment, based on the same pension payments; 4) intentional infliction of emotional distress based on Dorothy's alleged intentional concealment to the court in the divorce proceeding that her marriage to William was void because he was already married to Emelda and based on Dorothy's alleged blackmailing of William to obtain the QDRO; 5) negligent infliction of emotional distress.

### C.       The Summary Judgment Motion

Dorothy brings a summary judgment motion on the interpleader complaint and as to Emelda's cross-claims against her.  As to the former, Dorothy argues she is the only surviving spouse, as a matter of law and therefore, is entitled to William's survivor benefits.  In particular, Dorothy argues that Emelda's marriage to William in 1975 was void from the outset because William was still married to Rose at that time; on the other hand, Dorothy asserts, her own marriage to William, in 1994, was valid because William's divorce from Rose had been finalized and therefore, she qualifies as a "surviving spouse" based on the fact that she was "legally married to the Participant for a continuous period of not less than 1 year of the Participant's Pension Commencement Date."  *See* McClure Decl., Ex. A, Section 1.35(a)(i).  In the alternative, Dorothy asserts, she is a surviving spouse based on the provision in the QDRO designating her as such.  The definition of "surviving spouse" under the Plan, Dorothy points out, expressly incorporates QDROs that address this question.  Dorothy argues further that Emelda is not entitled to receive William's survivor benefits as a "putative spouse" because Emelda does not meet the requirements for being considered a putative spouse and even if she did, the Plan does not provide for payment of survivor benefits to putative spouses.

With respect to Emelda's cross-claims, Dorothy argues as a preliminary matter that there is a conflict of laws between the law of Louisiana and that of California because in California,

United States District Court

For the Northern District of California

1  community property terminates when spouses physically separate and any property acquired after

2  that is considered separate property, whereas under Louisiana law, community property does not

3  terminate until there is a divorce decree or one of the parties dies.  Dorothy asserts that California

4  law should be applied to the tort claims because property follows the laws of the state where the

5  income was earned.  Applying the law of California, Dorothy argues that she is entitled to the

6  pension benefit payments that are the object of Emelda's claims for conversion, trespass to chattel

7  and unjust enrichment claims.  Specifically, Dorothy argues that under California law, Emelda has

8  no community property interest in earnings received by William after his separation from Emelda

9  and that Emelda and William separated, as a matter of law, no later than July 1994, when William

10  and Dorothy married.  Therefore, Dorothy asserts, Emelda did not acquire any interest in the

11  payments received by Dorothy as her share of the community property.  In the alternative, Dorothy

12  asserts that under *both* California and Louisiana law, where a decedent had both a legal wife and a

13  putative wife, the estate should be divided equally between the two wives.  Therefore, to the extent

14  Dorothy received half of her community property share of William's pension benefits, this was the

15  share to which she was entitled and Emelda has no superior claim to those payments.

16      Dorothy seeks summary judgment on Emelda's claim for intentional infliction of emotional

17  distress on the grounds that: 1) there is no evidence other than Emelda's statements – which are

18  double hearsay – that Dorothy blackmailed William to receive half of William's community

19  property; 2) Dorothy did not misrepresent to the court in her divorce proceeding with William that

20  she was legally married to him because (i) she was legally married to William (even if Emelda was

21  William's putative spouse); (ii) she did not know about William's marriage to Emelda; and (iii) even

22  if she had known, the marriage between Emelda and William was void because William was married

23  to Rose when he married Emelda; 3) Emelda cannot establish causation because Dorothy didn't do

24  anything directly to Emelda and Emelda's alleged emotional distress resulted from

25  misrepresentations and/or omissions on the part of William.

26

27

28                                                          11

**United States District Court**
For the Northern District of California

1   Finally, Dorothy argues she is entitled to summary judgment on Emelda's claim for negligent

2   infliction of emotional distress. Dorothy argues that this claim fails because: 1) Dorothy has no duty

3   to Emelda; 2) there is no evidence of outrageous conduct and thus, there was no breach; and 3)

4   Emelda cannot establish causation of any emotional distress allegedly suffered by Emelda.

5   In her Opposition, Emelda argues that there are material issues of fact that preclude summary

6   judgment as to both the interpleader action and her tort claims against Dorothy. She argues that she

7   is entitled to survivor benefits because her 1975 marriage to William, while voidable, was not

8   actually void under Nevada law and therefore, she was William's legal spouse at the time of his

9   death and had been for more than one year, as required under Section 1.35(a) of the Plan to satisfy

10   the definition of "surviving spouse." In support of this assertion, Emelda argues that she and

11   William never separated, even though they had "ups and downs" between 1975 (the year they

12   married in Nevada) and William's death in 2007. On the other hand, Emelda argues, Dorothy's

13   marriage to William was legally void because Dorothy allegedly knew that William was married to

14   Emelda when she married William; for this reason Dorothy also was not William's putative spouse,

15   Emelda argues, because Dorothy did not act in good faith. Further, Emelda asserts, the QDRO on

16   which Dorothy relies in support of her application for William's survivor benefits is void because it

17   arose out of a void marriage and was based on fraud.

18   With respect to the cross-claims, Emelda does not challenge Dorothy's assertion that these

19   claims are governed by California law. Rather, she argues that the claims survive summary

20   judgment under California law. In particular, she argues that she is entitled to at least 50% of

21   William's pension benefits on the basis that she was William's putative spouse and therefore, his

22   pension benefits were quasi-community property. As to the claim for intentional infliction of

23   emotional distress, Emelda argues the claim should survive because the evidence shows that

24   Dorothy's conduct was outrageous. Emelda does not address Dorothy's specific arguments that

25   there is no admissible evidence of blackmail or regarding causation of harm. Emelda argues that

26   summary judgment should not be entered on the claim for negligent infliction of emotional distress

27

28                                                12

**United States District Court**

For the Northern District of California

1   because the facts and exhibits show that Dorothy breached a duty not to expose another to

2   unreasonable risk of injury and that Emelda was harmed as a result.

3        Dorothy filed a Reply reiterating the points raised in the Motion.  In addition, the Trustees

4   filed a response to Emelda's Opposition.  In the response, the Trustees took the position that under

5   the Plan, survivor benefits are payable to legal spouses only, and not to putative spouses.  To the

6   extent state law gives rise to a different result, the Trustees asserted, it is preempted by ERISA.

7        At oral argument, Emelda's counsel argued for the first time, that Emelda qualified as a

8   Surviving Spouse under subsection (c) of the Plan because she was "eligible to receive a Survivor

9   Pension" as of July 1, 1976 as a putative spouse and she never remarried.  The parties submitted

10  supplemental briefs on this issue.  The Trustees and Dorothy reject Emelda's reliance on subsection

11  (c), asserting that provision applies only to a spouse who was actually receiving a survivor pension

12  as of July 1, 1976 as of a result of the Participant having retired or died as of that date.  It is

13  undisputed that William had neither retired or died by July 1, 1976.  The Trustees further assert in

14  their supplemental brief that their interpretation of the Plan is entitled to deference and may be

15  overturned only if it amounts to an abuse of discretion.

16       **D.**     **The Chapman Default Judgment Motion**

17       The Clerk entered default against Joyce on June 3, 2009 based on her failure to appear in the

18  action.  Subsequently, the Trustees filed a motion for default judgment against her.  In support of the

19  motion, the Trustees filed a declaration by Joyce stating that although she had been named in the

20  complaint as Joyce Peters, her legal name has always been Joyce Chapman.  Declaration of Joyce

21  Chapman in Support of Plaintiffs' Application for Default Judgment ("Chapman Decl."), ¶ 1.  She

22  further states that she lived with William Peters for periods of time up to two years but never

23  married him, that she does not have a claim to William's survivor benefits under the Plan and that

24  she consents to entry of default judgment against her in this action.  *Id*., ¶¶ 2, 5.  Finally, she states

25  that she has "had the opportunity to consult with an attorney concerning the implications of

26  consenting to the entry of default judgment."  *Id*., ¶ 6.

27

28                                   13

United States District Court

For the Northern District of California

The Trustees seek an order declaring that Joyce Chapman has no interest in or claim to William's survivor benefits under the Plan.  Default Judgment Motion at 3.  In addition, they ask that the Court enter the following permanent injunction against Joyce:

> Defendant is permanently enjoined from commencing or maintaining any action against the Plaintiffs, the Pension Plan, the Welfare Plan, the Trustees of the Pension Plan or Welfare Plan, the ILWU, PMA, or the Plan's Offices regarding entitlement to the Survivor Pension benefits payable under the ILWU-PMA Pension Plan on account fo William J. Peters, Jr.

Proposed Order [Docket No. 70].

### E.     The Peters Default Judgment Motion

The Clerk entered default against Rose Peters on June 3, 2009, based on her failure to plead or otherwise appear in this action.  The Trustees now bring a motion for default judgment against her.  In support of the motion, the Trustees filed a declaration by their attorney, Christine Hwang, stating that she has spoken with Rose on two occasions, on May 28, 2009 and June 8, 2009, and that Rose told her that she "has no intention of responding or participating in the present case." Declaration of Christine S. Hwang in Support of Plaintiffs' Application for Default Judgment by Court Against Defendant Rose Peters ("Hwang Decl."), ¶ 3.

The Trustees seek an order declaring that Rose has no interest in or claim to William's survivor benefits under the Plan.  Default Judgment Motion at 3.  In addition, they ask that the Court enter the following permanent injunction against Rose:

> Defendant is permanently enjoined from commencing or maintaining any action against the Plaintiffs, the Pension Plan, the Welfare Plan, the Trustees of the Pension Plan or Welfare Plan, the ILWU, PMA, or the Plan's Offices regarding entitlement to the Survivor Pension benefits payable under the ILWU-PMA Pension Plan on account fo William J. Peters, Jr.

Proposed Order [Docket No. 71].

## III.     ANALYSIS

### A.     Legal Standard Applicable to Rule 56 Motions

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to

14

**United States District Court**
For the Northern District of California

1  any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ.

2  P. 56(c). In order to prevail, a party moving for summary judgment must show the absence of a

3  genuine issue of material fact with respect to an essential element of the non-moving party's claim,

4  or to a defense on which the non-moving party will bear the burden of persuasion at trial. *Celotex*

5  *Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Further, "*Celotex* requires that for issues on which the

6  movant would bear the burden of proof at trial, that party must show affirmatively the absence of a

7  genuine issue of material fact," that is, "that, on all the essential elements of its case on which it

8  bears the burden of proof at trial, no reasonable jury could find for the non-moving party."

9  *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1116 (11th Cir. 1993). Once the movant has made this

10  showing, the burden then shifts to the party opposing summary judgment to designate "specific facts

11  showing there is a genuine issue for trial." *Id*. at 323. On summary judgment, the court draws all

12  reasonable factual inferences in favor of the non-movant. *Anderson v. Liberty Lobby Inc.,* 477 U.S.

13  242, 255 (1986).

14  **B.**      **Legal Standards Applicable to Interpleader Complaints under ERISA**

15  Under section 502(a) of ERISA, a fiduciary of an employee welfare benefit plan may bring

16  an action "(A) to enjoin any act or practice which violates any provision of this subchapter or the

17  terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or

18  (ii) to enforce any provisions of this subchapter or the terms of the plan." 29 U.S.C. § 1132(a)(3).

19  The Ninth Circuit has held that an interpleader action to determine who, among multiple possible

20  claimants, should be awarded plan benefits is cognizable under ERISA as "appropriate equitable

21  relief" to enforce to the terms of the plan. *Aetna Life Ins. Co. v. Bayona*, 223 F.3d 1030, 1034 (9th

22  Cir. 2000).

23  Interpleader actions may be brought under the federal interpleader statute, in which case

24  jurisdiction is based on its own specific diversity provision, 28 U.S.C. § 1335. *See* 7 Wright, Miller

25  and Cane, Federal Practice and Procedure §1710 (3d ed. 2001). Alternatively, where subject matter

26  jurisdiction exists under the general subject-matter and diversity jurisdiction provisions, 28 U.S.C.

27

28                                                          15

United States District Court

For the Northern District of California

§§ 1331, 1332, as is the case here, an interpleader action may be brought under Rule 22 of the Federal Rules of Civil Procedure.  Rule 22 of the Federal Rules of Civil Procedure allows joinder for interpleader of "[p]ersons with claims that may expose a plaintiff to double or multiple liability."

In an interpleader action, the court must first determine that the stakeholder has a right to "compel claimants to litigate their numerous claims in one proceeding and to confine total recovery to amount not exceeding the deposited fund."  *Great American Ins. Co. v. Bank of Bellevue*, 366 F.2d 289, 293 (8th Cir. 1966).  If an interpleader action is found to be appropriate, the court determines the relative rights of the claimants to the funds at stake.  *Aetna Casualty & Surety Co. v. Ahrens*, 414 F. Supp. 1235, 1249 (S.D. Tex. 1975).  At this stage, "each claimant occupies an adversary position as to the other claimants and must proceed accordingly."  *Id.*  "Each claimant will file an answer setting out a statement of his claim to the res (the 'fund') in contest, an answer to the claim of his opponent, if appropriate, and a statement of any additional claim he may have against the stakeholder or the other claimants within the limits of counterclaims."  *Id.*

### C.   The Interpleader Complaint

Dorothy asserts that she is entitled to 100% of William's survivor benefits, as a matter of law, on the grounds that: 1) she was legally married to William for over a year as of the pension commencement date; 2) the separation agreement and QDRO expressly provided that Dorothy would be entitled to William's survivor benefits;  3) Emelda does not fall within any of the definitions of "surviving spouse" set forth in the Plan; and 4) California law addressing quasi-community property does not apply.  In addition, the Trustees argue that California law relating to quasi-community property is preempted by ERISA to the extent it requires the payment of those benefits to someone who does not qualify as a surviving spouse under the Plan.

The Court finds, as a matter of law, that under the express terms of the Plan, Dorothy is a "surviving spouse" and Emelda is not.  A more difficult question is whether Emelda is, nonetheless, entitled to receive a share of the survivor pension benefit under California law governing quasi-community property.  This body of state law has been developed in equity to protect the interests of

16

individuals who had a good-faith belief that they were validly married to their deceased spouse. Unfortunately, recent Supreme Court case law leaves no room to award Emelda any survivor pension benefits under this state law because it is preempted by ERISA. Therefore, the Court concludes that Dorothy is entitled to summary judgment on this issue as well.

> **1.     Whether Dorothy or Emelda Qualifies as a "Surviving Spouse" Under the Plan**

Dorothy argues that she is a "surviving spouse" under Section 1.35(a) of the Plan because she was "legally married to the Participant for a continuous period of not less than 1 year as of the Participant's Pension Commencement Date." McClure Decl., Ex. A, Section 1.35(a). In addition, she points to the fact that the entire definition of "surviving spouse" is "[s]ubject to the provisions of any Qualified Domestic Relations Order to the extent it requires any other person to be treated as a Surviving Spouse," arguing that she is a surviving spouse because the QDRO expressly provides that Dorothy is to be treated as William's surviving spouse in connection with Williams' survivor benefits *Id.* Emelda asserts that she is a "surviving" spouse under subsection (a) of the Plan definition or, in the alternative, subsection (c). She argues further that Dorothy cannot be considered a surviving spouse by virtue of the QDRO because that order was obtained by fraud, namely, by allegedly concealing from the judge in that case that Dorothy knew William was married to Emelda and that her own marriage to William was void. The Court concludes that Dorothy falls within the Plan's definition of "surviving spouse" under subsection (a) and on the basis of the QDRO, while Emelda does not satisfy the Plan's definition of "surviving spouse."

As a preliminary matter, the Court must resolve which subsection of section 1.35 of the Plan applies in this case. The Court concludes that subsection (a) applies because William both retired and died after 1987. As is explained in the Summary Plan Description and the Trustees' supplemental brief, the various subsections of Section 1.35, defining "surviving spouse," provide alternative definitions depending on when the Plan participant retired and/or died. Subsection (a) applies to spouses of Plan participants who retired or died after June 30, 1987. Subsection (b)

United States District Court
For the Northern District of California

applies to spouses of Plan participants who retired or died between July 1, 1976 and June 30, 1987. According to the Trustees, subsection (c) applies to the spouses of Participants who died on or before July 1, 1976 and were consequently receiving Survivor Pension benefits on July 1, 1976, the date the Plan was amended.  To the extent that subsections (c) and (d) both apply in cases where the Participant retired or died before July 1, 1976, the two sections are distinguishable because the former covers *legal* spouses while the latter covers *putative* spouses.  Because William had not retired or died as of July 1, 1976,  Emelda was not eligible to receive survivor pension benefits as of that date and therefore, neither subsection (c) nor (d) apply.

Next, the Court addresses whether subsection (a) applies to either Dorothy or Emelda.  The Court finds that Dorothy qualifies as a surviving spouse under that section while Emelda does not. Dorothy's marriage to William, in 1994, was legal because the undisputed evidence shows that at the time of that marriage, William had already obtained a judgment in the divorce proceeding with Rose and his marriage to Emelda was void. [4]  In determining that the marriage between William and Emelda was void, the Court applies the law of Nevada.  *See* Cal. Fam. Code § 308 ("[a] marriage contracted outside this state that would be valid by the laws of the jurisdiction in which the marriage was contracted is valid in this state"); *Jones v. Jones*, 182 Cal. App. 2d 80, 82 (1960) (holding that where divorce was invalid under law of state where parties were married, it was also invalid in California and therefore, subsequent marriage in California was void as bigamous).  Under Nevada law, a bigamous marriage is "void without any decree of divorce or annulment or other legal proceedings."  Nevada Revised Statute § 125.209(2); *see also Williams v. Williams*, 120 Nev. 559, 564 (2004) (holding that marriage was void under § 125.209 because purported wife was still married to another at the time of marriage).  Accordingly, Emelda's 1975 marriage to William was void on the basis that William was married to Rose at the time he married Emelda.

Conversely, Emelda does not qualify as a "surviving spouse" under subsection (a).  First, as discussed above, her 1975 marriage to William was void.  Second, her marriage to William in 2007

---

[4]As noted above, there is no evidence in the record that William was ever married to Joyce.

United States District Court
For the Northern District of California

United States District Court

For the Northern District of California

occurred less than a year before William's death and thus does not satisfy the definition of "surviving spouse" under the Plan. Further, even assuming Emelda was William's putative spouse, there is no authority suggesting that any of the states whose law might apply would consider a putative spouse to be "legally" married, as required under the Plan to be considered a "surviving spouse." In fact, the Ninth Circuit has expressly held that under California law, "[m]arriage is a status precisely defined . . . and does not cover putative spouses." *Allen v. Western Conference of Teamsters Pension Trust Fund*, 788 F.2d 648, 650 (9th Cir. 1986).

The Court also finds that Dorothy qualifies as a surviving spouse under the Plan based on the QDRO, which provides that she shall be considered a surviving spouse. The Plan's definition of "surviving spouse" expressly incorporates the terms of the QDRO. Nor does the Court find any authority suggesting that it can or should disregard the QDRO on the basis of evidence that Dorothy may have been aware of William's marriage to Emelda, particularly as William's marriage to Emelda was in fact legally void.

### 2. Whether California Community Property Law Entitles Emelda to a Share of William's Survivor Benefits

Emelda asserts that even if she is not a surviving spouse under the Plan, she is entitled to receive a share of William's survivor benefits on the basis that she was William's putative spouse under California law governing community property and quasi-community property.[5] She relies heavily on a decision by a court in this district, *Western Conference of Teamsters Pension Trust Fund v. Jones*, 646 F. Supp. 228 (N.D. Cal. 1986). Dorothy argues that *Jones*, as well as the case on which the court in that case relies, *Patillo v. Norris*, 65 Cal. App. 3d 209 (1976), does not apply and that the case that *does* apply is *Allen v. Western Conference of Teamsters*, 788 F.2d 648 (9th Cir. 1986). Dorothy does not address whether California community property law is preempted by ERISA. The Trustees also rely on *Allen* to support the proposition that the requirement of the plan

---

[5]Emelda does not dispute the position taken by Dorothy in her brief that California community property law applies rather than the law of Nevada or Louisiana.

**United States District Court**

For the Northern District of California

1    that eligible beneficiaries be legally married to the plan participant should be enforced.  The

2    Trustees further cite to two recent Supreme Court cases, *Boggs v. Boggs,* 520 U.S. 833 (1997) and

3    *Egelhoff v. Egelhoff,* 532 U.S. 141 (2001) – both decided after *Jones* and *Patillo* – to argue that

4    California law governing quasi-community property is preempted by ERISA.  Because the Court

5    finds the question of preemption to be a difficult one, it examines in some detail the law relating to

6    quasi-community property and ERISA preemption.

7           Dorothy and the Trustees rely heavily on *Allen* in support of the position that a putative

8    spouse is not entitled to benefits under an ERISA-covered pension plan that limits beneficiaries to

9    those who are legally married to the Plan participant.  In *Allen*, a putative spouse sought an award of

10   death and survivor benefits after the individual she believed she was legally married to died.  788

11   F.2d at 649.  Only after her husband's death did she learn that his divorce from his previous wife had

12   never been finalized, and therefore, her own marriage was void.  *Id.*  The Plan in that case limited

13   survivor benefits to those who were *legally* married to the Plan participant and, on that basis, denied

14   benefits to the putative spouse.  *Id.*  The Ninth Circuit, acknowledging that the case was "sad," held

15   that the trust agreement was a private contract between parties and that the limitation of survivor

16   benefits to legal spouses was enforceable because it did not violate any public policy.  *Id.*  In a

17   footnote, however, the court left open the possibility that a putative spouse might be able to recover

18   a share of the survivor benefits, even if the Plan limited benefits to one who was legally married to

19   the participant, "as quasi-marital property on account of contributions that may have been made

20   during the putative marriage."  *Id.* n.1 (citing *Patillo*, 65 Cal. App. 3d 209).  The court noted that this

21   issue had not been raised by either party.  *Id.*  Further, as a factual matter it appears that there may

22   have been no quasi-community property contributions, as the putative marriage lasted only 19

23   months, and during that time, the putative spouse was "the family's principal breadwinner."  *Id.* at

24   649.

25           The *Patillo* case explains the theory of quasi-marital property in the context of claims by

26   both a legal wife and a putative wife to work-related insurance and union pension benefits following

27

28                                              20

the death of the participant, where the decedent had named a third individual (who was not legally

married to the participant) as the beneficiary.  65 Cal. App. 3d at 212.  The court stated as follows:

> The basic principle involved in the case of a married man who designates someone other than his wife as the named beneficiary of insurance or pension benefits is that, to the extent the premiums were paid with community funds or the benefits were earned by the husband from his employer during the marriage, on his death the wife is entitled to set aside the gift made to the named beneficiary without consideration and without her consent, to the extent of one-half of the community property interest . . . . The theory is that the husband has the power to give his half of the community property to the named beneficiary, but not the wife's half . . . . Obviously, to the extent that the premiums were paid with the husband's separate property, or the pension benefits earned while the husband was separated from the wife, the husband is perfectly free to name the beneficiary without regard to the wife's wishes. Where the proceeds are attributable in part to community property and in part to separate property, it is the duty of the trial court to make an allocation.

*Id*. at 217 (citations omitted).

Emelda argues that the quasi-community property doctrine applies here.  She relies, in large part, on the decision of Judge Conti, of this Court, in *Jones*.  In that case, two women claimed they were entitled to the death and survivor benefits under the decedent's union pension plan as surviving spouses.  646 F. Supp. at 229.  The first woman, Bessie, legally married the plan participant in 1960. *Id*.  In 1972, Bessie separated from the participant and filed a petition for dissolution, but no dissolution order was ever entered.  *Id*.  In 1973, while he was still married to Bessie, the participant married Karen.  *Id*.  Karen was unaware that the dissolution with Bessie had not been finalized and lived with the plan participant, believing that their marriage was legal, until his death in 1985.  *Id*. As is the case here, the plan required that a qualified surviving spouse must have been *legally* married to the plan participant.  *Id*.  On that basis, the trust fund that administered the plan took the position that *Allen* applied and therefore, Bessie was entitled to 100% of the survivor and death benefits.  *Id*.  Judge Conti disagreed, holding as follows:

> In the present action, the Trust Fund argues that *Allen* determines the defendants' rights regarding Earl's pension benefits. Although *Allen* does determine the rights of a legal surviving spouse asserting a claim as a beneficiary of the pension agreement, *Allen* does not apply to a putative spouse's claim asserting a quasi-marital property interest in the pension benefits. Unlike the putative spouse in *Allen*, Karen does not assert her right to the pension benefits solely through the contractual terms of the trust agreement. Karen also claims, as Earl's putative spouse, a portion of Earl's pension benefits as quasi-marital property. In *Allen*, the Ninth Circuit expressly left unanswered the merits of such a claim.

**United States District Court**

For the Northern District of California

1   *Id*. at 230.  Judge Conti went on to deny the trustees' request for summary judgment, holding that the

2   court was required to make a factual determination as to the proper allocation of benefits between

3   Bessie and Karen.  *Id*. at 232.

4          The doctrine of quasi-community property was acknowledged in *In re Cramer*, 20 Cal. App.

5   4th 73 (1993), a case that Dorothy cites for the proposition that even if a pension was funded entirely

6   by community funds, a putative spouse would have no claim to benefits if the plan limited

7   beneficiaries to legal spouses.  In fact, *Cramer* does not stand for this proposition.  In *Cramer*, the

8   decedent and his wife dissolved their marriage; at the time they did so, they entered into an

9   agreement whereby the former wife was designated as beneficiary of the husband's death and

10  survivor benefits and was entitled to receive her community property share of his retirement

11  payments.  *Id*. at 76.  The wife apparently received her share of the retirement benefits while her

12  former husband was alive, but when he died, the plan administrator denied her survivor and death

13  benefits on the basis that the plan did not include *former* spouses in its definition of "surviving

14  spouse."  *Id*. at 75-76.  The court upheld this determination, but it noted that the former wife would

15  have been entitled to "receive any amounts paid into the retirement plan which exceeded the benefits

16  which had been paid out by the time of decedents death . . . includ[ing] [the former wife's]

17  community property contribution."  *Id*. at 76-77.  It was only because there was no evidence of such

18  excess that the former wife did not have a claim to reimbursement of her community property

19  contribution.  *Id*. at 77.

20         Dorothy argues that *Jones* and *Patillo* are distinguishable from this case because those cases

21  "did not deal with plan eligibility issues."  Reply at 7.  This distinction is unpersuasive.  Emelda's

22  argument is based on the position that she, like the putative spouse in *Jones*, is entitled under

23  California community property law to at least a share of William's survivor benefits even if she was

24  *not* technically eligible to receive such benefits as a "surviving spouse" under the terms of the Plan.

25  *Jones* and *Cramer* suggest that Emelda could be entitled to a share of William's survivor benefit to

26  the extent that she may have been the putative spouse of William between 1975 and at least 1979.

27

28

During this time, William was working and therefore presumably making contributions to the Plan from William and Emelda's community property.  Under the approach taken in *Jones*, there might be a factual question as to the proper allocation of the survivor benefit.  Nonetheless, the Court is troubled by the question of ERISA preemption of California community property law.

In *Jones*, Judge Conti held that ERISA does not "preempt state community property laws affecting the distribution of pension benefits." 646 F. Supp. at 230.  Judge Conti, however, did not discuss the preemption question except to cite the Ninth Circuit's decision in *Carpenters Pension Trust for Southern California v. Kronschnabel,* 632 F.2d 745, 748 (9th Cir. 1980).

In *Kronschnabel*, a final judgment in the dissolution of a marriage between a plan participant and his legal spouse provided that the participant's future pension benefit payments were community property to which the spouse was entitled a one-half share.  632 F.2d at 745.  The trust brought an action in federal court asserting that the state-court dissolution was preempted to the extent that it required payment of pension benefits to the divorced spouse.  *Id*.  The Ninth Circuit disagreed.  It found that the Supreme Court's failure to grant *certiorari* in a similar case, *In re Campa*, 89 Cal. App. 3d 113 (1979), dismissed, 444 U.S. 1028 (1980), amounted to a binding holding that such state court orders were not preempted by ERISA.  *Id*. at 747.  In *Campa*, the California Court of Appeal held that "ERISA does not preempt a state-court order in a dissolution action that requires the trustees of a pension plan to divide pension payments between the employee and his or her ex-spouse."  *Id*.  The California Supreme Court denied review.  The Supreme Court denied *certiori* "for want of a substantial federal question."  *Id*.  In doing so, the *Kronschnabel* court held, the Supreme Court essentially held that the state court order was not preempted.  This court has found no case that expressly overrules *Kronschnabel*.

The Trustees argue, however, that Emelda's quasi-community property claim is preempted under *Boggs* and *Egelhoff*, both of which were decided after *Jones* and *Patillo*.  In *Boggs*, the Court held that ERISA preempted a state law that allowed a nonparticipant spouse to transfer by testamentary instrument an interest in undistributed pension plan benefits.  520 U.S. at 835-836.

United States District Court

For the Northern District of California

United States District Court
For the Northern District of California

There, it was undisputed that the sons of a surviving first wife would have been entitled, under state law, to a community property share of the plan participant's benefits – including a survivors annuity, the monthly annuity payments that had been made to the plan participant prior to his death, funds in the participant's IRA, and shares of stock – by virtue of the fact that their mother had bequeathed her community property share in the benefits to them when she died. *Id.* at 836. The second wife challenged the sons' right to a share of the benefits, asserting that the testamentary transfer of the first wife's community property interest was preempted by ERISA. *Id.* The Court agreed.

While acknowledging that state community property law is "not lightly to be abrogated," the Court concluded that there was an actual conflict between ERISA and the state law at issue in that case. *Id.* at 847. The Court relied, in large part, on the provisions of the Retirement Equity Act of 1984 ("REA"). The *Boggs* Court explained that one of Congress' "central purposes" in enacting REA was to "give enhanced protection to the spouse and dependent children in the event of divorce or separation, and in the event of death [of] the surviving spouse." *Id.* To achieve this objective, Congress strengthened ERISA's protections for surviving spouses in 29 U.S.C. § 1055 and added "QDRO provisions" in § 1056. *Id.* at 846.

The QDRO provisions are found in paragraph 3 to subsection (d) of § 206(d), 29 U.S.C. § 1056(d). As amended, subsection (d)(3)(A) provides that "[e]ach pension plan shall provide for the payment of benefits in accordance with the applicable requirements of any qualified domestic relations order." 29 U.S.C. § 1056(d)(3)(A). A QDRO, in turn, is defined as an order that "relates to the provision of child support, alimony payments, or marital property rights to a spouse, former spouse, child, or other dependent of a participant, and . . . is made pursuant to a State domestic relations law (including a community property law)." 29 U.S.C. § 1056(d)(3)(B)(ii). A QDRO must meet the following requirements under this provision:

> (C) A domestic relations order meets the requirements of this subparagraph only if such order clearly specifies–
>
> (i) the name and the last known mailing address (if any) of the participant and the name and mailing address of each alternate payee covered by the order,

24

United States District Court

For the Northern District of California

(ii) the amount or percentage of the participant's benefits to be paid by the plan to each such alternate payee, or the manner in which such amount or percentage is to be determined,

(iii) the number of payments or period to which such order applies, and

(iv) each plan to which such order applies.

(D) A domestic relations order meets the requirements of this subparagraph only if such order--

(i) does not require a plan to provide any type or form of benefit, or any option, not otherwise provided under the plan,

(ii) does not require the plan to provide increased benefits (determined on the basis of actuarial value), and

(iii) does not require the payment of benefits to an alternate payee which are required to be paid to another alternate payee under another order previously determined to be a qualified domestic relations order.

29 U.S.C. § 1056(d)(3)(C) &(D).

The *Boggs* Court found that in light of the REA amendments, state law allowing a testamentary transfer of a community property interest in an ERISA pension plan was preempted, explaining as follows:

> The surviving spouse annuity and QDRO provisions, which acknowledge and protect specific pension plan community property interests, give rise to the strong implication that other community property claims are not consistent with the statutory scheme. ERISA's silence with respect to the right of a nonparticipant spouse to control pension plan benefits by testamentary transfer provides powerful support for the conclusion that the right does not exist.

*Id*. at 847.  The Court expressly rejected the argument, raised in *amicus* briefs, that because the REA was, in essence, a codification of cases that (like *Kronschnabel*) relied on the denial of *certiorari* in *Campa* to create a common-law expansion of the ERISA's definition of beneficiary, and because those cases (and by extension, Congress) did not *consider* state laws governing testamentary transfers, those laws should not be found to have been preempted by ERISA.  The Court reasoned:

> We disagree with this reasoning. It is true that the subject of testamentary transfers is somewhat removed from domestic relations law. The QDRO provisions address the rights of divorced and separated spouses, and their dependent children, which are the traditional concern of domestic relations law. The pre-REA federal common-law extension of § 1002(8)'s definition of "beneficiary" by  courts in the context of marital dissolution was in part based on an appreciation of the fact that domestic relations law is primarily an area of

25

**United States District Court**

For the Northern District of California

1
2
3
4
5
6
7

state concern, see *Marriage of Campa*, *supra*, at 124, 152 Cal. Rptr. at 367-368, and the basic principle that a beneficiary's interest in a spendthrift trust, despite otherwise applicable protections, can be reached in the context of divorce and separation. See E. Griswold, Spendthrift Trusts 389-391 (2d ed.1947) (summarizing state case law); Restatement (Second) of Trusts § 157 (1959). The state court in *Marriage of Campa* took its implicit determination that the nonparticipant spouse was a beneficiary to its logical conclusion, forcing the pension plan to join the marital dissolution proceedings as a party and compelling it to pay the spouse her share of the pension benefits. *Whether or not this extension of the definition of "beneficiary" was consistent with the statute then in force, these authorities are not applicable in light of the REA amendments.* The QDRO and the surviving spouse annuity provisions define the scope of a nonparticipant spouse's community property interests in pension plans consistent with ERISA.

8        *Id*. at 849 (emphasis added).

9        The Court reached a similar result in *Egelhoff*, relying on ERISA's express preemption

10   clause rather than on the existence of an actual conflict, as it had in *Boggs*.  In *Egelhoff*, a plan

11   participant died intestate soon after divorcing his former wife and at the time of his death she

12   remained the designated beneficiary under the plan and on a life insurance policy.  532 U.S. at 144.

13   The insurance proceeds were paid to the former spouse, but the children of the participant by a

14   previous marriage argued that they should receive them based on a state law providing that the

15   designation of a spouse as a beneficiary of a nonprobate asset is revoked automatically upon divorce.

16   *Id*.  The Court disagreed, finding that although there was no actual conflict with any specific

17   provision of ERISA, the law fell within ERISA's preemption clause.  *Id*. at 146 (citing 29 U.S.C. §

18   1144(a)).  The ERISA preemption clause states that ERISA "shall supersede any and all State laws

19   insofar as they may now or hereafter relate to any employee benefit plan" covered by ERISA.  *Id*.

20   The Court in *Egelhoff* found that the state law at issue was "related to" ERISA, and thus preempted,

21   because 1) "[t]he statute binds ERISA plan administrators to a particular choice of rules for

22   determining beneficiary status [and] the administrators must pay benefits to the beneficiaries chosen

23   by state law, rather than to those identified in the plan document; and 2) "it interferes with nationally

24   uniform plan administration . . .[which is] one of the principal goals of ERISA."  *Id*. at 147-148.

25   The Court expressed particular concern that "[r]equiring ERISA administrators to master the

26   relevant laws of 50 states and to contend with litigation would undermine the Congressional goal of

27

28                                                     26

United States District Court

For the Northern District of California

'minimizing the administrative and financial burden[s]' on plan administrators – burdens ultimately borne by the beneficiaries." *Id*. at 149-150.

Having carefully considered the reasoning in both *Boggs* and *Egelhoff*, the Court concludes that the earlier cases on which Emelda relies no longer apply to the extent they hold that California's quasi-community property law is not preempted by ERISA.  In reaching this conclusion, the Court finds particularly persuasive the fact that the *Boggs* Court expressly held that the pre-REA cases that found a common-law extension of the term "beneficiary" under ERISA were no longer applicable. Rather, under *Boggs*, the carefully crafted mechanism created in REA was intended to preempt state laws except to the extent recognized in the annuity and QDRO provisions.  Further, the concerns invoked by the Court in *Egelhoff* are clearly at issue here as well; requiring the Plan to master the community property law of California and Louisiana, as well as to address complicated questions relating to conflicts of laws, defeats ERISA's goal of uniform plan administration.

Accordingly, the Court concludes that Dorothy is entitled, as a matter of law, to William's entire survivor benefit as the only "surviving spouse" under the Plan.[6]

**D.    The Cross-Claims**

**1.    Conversion, Trespass, and Unjust Enrichment**

Dorothy seeks summary judgment on Emelda's claims for conversion, trespass, and unjust enrichment on the basis that all of these claims turn on whether Dorothy was entitled to receive the monthly payments of $485.00 that were paid to her by the Plan between April 26, 2006 and William's death in 2007, to which she was entitled under the QDRO.  The Court agrees.

---

[6]The Court's conclusion is not limited to Emelda but rather, applies to Rose and Joyce as well. As discussed further below, both Rose and Joyce were properly served and chose not to appear in this action.  Because they have defaulted, the Court's decision with respect to the interpleader action is binding upon them.  *See, e.g., Sun Life Assur. Co. of Canada v. Kimble*, 2007 WL 3313448 (E.D.Cal., Nov. 6, 2007) (entering default judgment against defendant in interpleader action who did not appear and holding that that defendant had no claim or interest in the funds that were the subject of the interpleader action).  The Court also notes that Joyce expressly disclaimed any interest in William's survivor benefits.

United States District Court

For the Northern District of California

1    As discussed above, ERISA expressly provides that a plan that is governed by ERISA must

2    enforce the terms of a QDRO so long as the QDRO meets the requirements of 29 U.S.C. §

3    1056(d)(3).  Here, Emelda has not asserted that the QDRO does not meet the requirements set forth

4    in ERISA.  Nor has she sought to modify the QDRO in state court.  *See In re Marriage of Oddino*,

5    16 Cal. 4th 67, 80 (1997) ("federal courts cannot themselves issue or modify domestic relations

6    orders").  Finally, she does not contend that the *amount* of the monthly pension payments that were

7    made to Dorothy were calculated incorrectly under the QDRO.  Rather, her claims for conversion,

8    trespass and unjust enrichment are based on the theory that the QDRO should not have been

9    enforced.  As such, those claims directly conflict with the QDRO provisions of ERISA.  Therefore,

10   the Court concludes that the claims are preempted.

11   Further, even if the claims were not preempted, Dorothy would be entitled to summary

12   judgment on the merits.  First, the Court does not find any authority that a QDRO should be

13   invalidated on the basis that a wife was aware at the time of the divorce that her husband was

14   married to another, particularly where the other marriage was, in fact, void.  Second, there is no

15   admissible evidence that Dorothy obtained the QDRO by blackmailing William.  The only evidence

16   offered in support of this assertion is Emelda's hearsay statement that William told her Dorothy had

17   blackmailed him.  *See* Emelda Decl., ¶ 48.  That statement does not satisfy the requirements for

18   making an exception to the hearsay rule because although William is deceased, and therefore

19   unavailable under Rule 804(a)(4) of the Federal Rules of Evidence, the statement was not made

20   against interest, as required under Rule 804(b)(3) to qualify as an exception.  Therefore, the

21   evidenceis not sufficient to defeat Dorothy's Summary Judgment Motion as to Emelda's claims for

22   conversion, trespass, and unjust enrichment.  Summary Judgment Motion at 18-19.[7]

23   Emelda's claims for conversion, trespass, and unjust enrichment fail as a matter of law.

24

25   _____

26   [7]Dorothy agues in the alternative that under California law, Emelda is not entitled to any
     community property interest for the period of Dorothy's marriage to William because Emelda was, as
27   a matter of law, separated from William by this time.  The Court need not reach this argument.

28

United States District Court

For the Northern District of California

### 2.        Intentional Infliction of Emotional Distress

Dorothy seeks summary judgment on Emelda's claim against her for intentional infliction of emotional distress, arguing that there is no evidence of outrageous conduct.  The Court agrees.

The elements of a cause of action for intentional infliction of emotional distress are: 1) extreme and outrageous conduct by the defendant; 2) intention to cause or reckless disregard of the probability of causing emotional distress; 3) severe emotional suffering; and 4) actual and proximate causation of the emotional distress.  *Agarwal v. Johnson*, 25 Cal. 3d 932, 946 (1979), *overruled on other grounds*, *White v. Ultramar, Inc.*, 21 Cal. 4th 563 (1999).  In order for conduct to be outrageous it must be "so extreme as to exceed all bounds of that usually tolerated in a civilized community."  *Christensen v. Superior Court*, 54 Cal. 3d 868, 903 (1991) (citing *Davidson v. City of Westminister*, 32 Cal. 3d 197, 209 (1982)).  Here, no reasonable jury could find that Dorothy's conduct was outrageous, even construing all of the evidence in the record in Emelda's favor.

### 3.        Negligent Infliction of Emotional Distress

Dorothy also argues that she is entitled to summary judgment as to Emelda's claim for negligent infliction of emotional distress, asserting that she owes no duty to Emelda.  The Court concludes that Dorothy is correct.

The California Supreme Court has explained that "the  negligent causing of emotional distress is not an independent tort but the tort of negligence . . . ."  *Marlene F. v. Affiliated Psychiatric Medical Clinic, Inc.*, 48 Cal. 3d 583, 588 (1989) (citing 6 Witkin, Summary of Cal. Law (9th ed. 1988) Torts, § 838, p. 195)).  Thus, "[t]he traditional elements of duty, breach of duty, causation, and damages apply."  *Id.* (citation omitted).  "Whether a defendant owes a duty of care is a question of law."  *Id.* (citations omitted).  While the general rule under California law is that all persons are required to use ordinary care to prevent others being injured as the result of their conduct, an exception may be made based on public policy.  *Rowland v. Christian*, 69 Cal. 2d 108, 113 (1968).  In *Rowland,* the California Supreme Court described the inquiry as follows:

> A departure from this fundamental principle involves the balancing of a number of considerations; the major ones are the foreseeability of harm to the plaintiff, the degree of

29

**United States District Court**
For the Northern District of California

certainty that the plaintiff suffered injury, the closeness of the connection between the defendant's conduct and the injury suffered, the moral blame attached to the defendant's conduct, the policy of preventing future harm, the extent of the burden to the defendant and consequences to the community of imposing a duty to exercise care with resulting liability for breach, and the availability, cost, and prevalence of insurance for the risk involved.

*Id.*

Here, Emelda – who was not *legally* married to William until 2007 – asserts a claim against Dorothy for benefits that accrued prior to that time, during Dorothy's *legal* marriage to William, and which amount to Dorothy's community property share of those benefits.  Emelda points to evidence from which she asserts a jury could find both that she was a putative spouse at the time the benefits accrued and that Dorothy had reason to believe William was married to Emelda.  The Court, then, must determine whether a legal spouse who has reason to believe that her spouse is also married to another owes a duty of care to a putative spouse in negotiating the terms of a divorce so as to ensure that the putative spouse receives a fair share of the benefits.  The Court has not found any case law addressing this question, which also has not been briefed by the parties.  It concludes, however, that as a matter of public policy, a legal wife does not have a duty of care to a putative wife with respect to the terms of a divorce decree and, in particular, the terms relating to pension benefits that accrued during the marriage.

It is inappropriate to impose a burden on a legal spouse relative to her spouse's putative wife because the connection between the conduct of the legal spouse and the harm, if any, to the putative spouse is tenuous.  In particular, it is the conduct of the spouse who has entered into a bigamous marriage, not the legally married spouse, that results in harm to the putative spouse.  Further, allowing individuals who believe themselves to be putative spouses to bring what amounts to a collateral attack on an award of benefits made pursuant to a valid QDRO would undermine the statutory scheme that has been established by the California legislature with respect to the division of community property upon divorce.  Such claims would likely also directly conflict with ERISA, raising a serious question of preemption.  Therefore, the Court concludes that under the circumstances here, Emelda's claim for negligent infliction of emotional distress fails as a matter of

30

law.

**E.      Default Judgment Motions**

**1.      Legal Standard Regarding Entry of Default Judgment**

Under Federal Rule of Civil Procedure 55(b)(2), the court may enter a default judgment where the clerk, under Rule 55(a), has already entered the party's default based upon a failure to plead or otherwise defend the action.  The district court's decision to enter a default judgment involves some discretion.  *Lau Ah Yew v. Dulles*, 236 F.2d 415 (9th Cir. 1956) (affirming district court's denial of default judgment).  The court is free to consider a wide range of factors in deciding whether to enter a default judgment, including: "(1) the possibility of prejudice to the plaintiff, (2) the merits of plaintiff's substantive claim, (3) the sufficiency of the complaint, (4) the sum of money at stake in the action, (5) the possibility of a dispute concerning material facts, (6) whether the default was due to excusable neglect, and (7) the strong policy underlying the Federal Rules of Civil Procedure favoring decisions on the merits."  *Eitel v. McCool*, 782 F.2d 1470, 1471-72 (9th Cir. 1986); *see also* Wright & Miller, *Federal Practice and Procedure*, Civil § 2685.

**2.      Whether Default Judgment Should be Entered Against Joyce**

In this action, the relevant dispute concerns to whom the Trustees should disburse William's survivor benefits.  As discussed above, Dorothy has established her right to those funds and therefore, both she and the Trustees would be prejudiced if default judgment were not granted because they would be denied the certainty and finality that judgment in an interpleader action is intended to provide.  *See Sun Life Assurance Co. v. Kimble*, 2007 WL 3313448 (E.D. Cal. Nov. 6, 2007) (granting default judgment in interpleader action brought to determine proper recipient of life insurance proceeds governed by ERISA); *see also Aetna Life Ins. Co. v. Bayona*, 223 F. 3d at 1034 ("Interpleader's primary purpose is not to compensate, but rather to protect stakeholders from multiple liability as well as from the expense of multiple litigation.")  Further, the Trustees have provided a declaration by Joyce Chapman stating that she was never married to William, that she does not claim any entitlement to his survivor benefits and that she does not object to entry of

31

United States District Court

For the Northern District of California

1    default judgment against her in this action.  Finally, Joyce's declaration indicates that her failure to

2    appear in this action was intentional and not a result of excusable neglect.

3         For the reasons stated above, the Court recommends that default judgment be entered against

4    Joyce precluding her from defending, litigating or contesting the Court's determination that

5    William's survivor pension benefits are payable solely to Dorothy.

6                    **3.        Whether Default Judgment Should be Entered Against Rose**

7         Again, because Dorothy has established her right to William's survivor benefits, both she

8    and the Trustees would be prejudiced if default judgment were not granted because they would be

9    denied the certainty and finality that judgment in an interpleader action is intended to provide.

10   Further, the Trustees have provided a declaration by Christine Hwang indicating that Rose has

11   intentionally defaulted in this action.  Therefore, the Court concludes that entry of default judgment

12   against Rose is warranted.  Accordingly, the Court recommends that default judgment be entered

13   against Rose precluding her from defending, litigating or contesting the Court's determination that

14   William's survivor pension benefits are payable solely to Dorothy.

15

16                   **4.        Whether Rose and Joyce Should be Enjoined from Initiating Future
                          Legal Actions**

17        The Trustees request that Rose and Joyce be enjoined from initiating any future legal action

18   regarding their entitlement to William's survivor pension benefits under the Plan.  The Court finds

19   that entry of such an injunction is appropriate in this case.

20        It is established that a federal court has the power to enjoin proceedings in other federal

21   courts, as well as in state courts, under appropriate circumstances.  *See* 18 Moore's Federal Practice

22   Guide § 131.53 (2008).  In particular, the All Writs Act, 28 U.S.C. § 1651, authorizes district courts

23   to "issue all writs necessary or appropriate in aid of their respective jurisdictions."  Further, the Anti-

24   Injunction Act, 28 U.S.C. § 2283, which limits the ability of federal courts to enjoin state court

25   proceedings, contains an exception for injunctions that are "necessary in aid of [the court's]

26   jurisdiction, or to protect or effectuate its judgment."  This exception is referred to as the

27

28                                                    32

**United States District Court**

For the Northern District of California

1    "relitigation exception." *Chick Kam Choo v. Exxon Corp.*, 486 U.S. 140, 147 (1988).  The Court

2    explained in *Chick Kam Choo* that:

> 3    The relitigation exception was designed to permit a federal court to prevent state litigation of
>      an issue that previously was presented to and decided by the federal court. It is founded in
> 4    the well-recognized concepts of res judicata and collateral estoppel.

5    *Id.*

6         A party seeking an injunction against relitigation must make the showing necessary for the

7    issuance of any injunction, that is, serious and irreparable harm.  *Beacon Theaters, Inc. v. Westover*,

8    359 U.S. 500, 506 (1959).  This standard is usually met, however, where there is a likelihood of

9    costly and judicially wasteful relitigation of claims and issues that were already adjudicated in

10   federal court.  *Quintero v. Klaveness Ship Lines*, 914 F.2d 717, 721 (5th Cir. 1990); *see also*

11   *Aristud-Gonzalez v. Government Development Bank for Puerto Rico*, 501 F.3d 24, 27 (1st Cir. 2007)

12   (" Injunctive relief incident to an interpleader action is also common – the whole purpose being to

13   avoid inconsistent results in separate lawsuits.").

14        Here, the Court has adjudicated the question who is entitled to William's pension benefits

15   and found that Dorothy is entitled to the full amount of those benefits.  Relitigation of that question

16   would be judicially wasteful and raise the possibility of inconsistent results.  It would also defeat the

17   purpose of the Trustee's  interpleader action.  Therefore, the Court concludes that an injunction

18   should be entered prohibiting Rose and Joyce from initiating any action, whether in state or federal

19   court, asserting an entitlement to William's survivor pension benefits.

20   **IV.    CONCLUSION**

21        For the reasons stated above, the Court recommends that Dorothy's Summary Judgment

22   Motion be GRANTED.  Dorothy is entitled to receive 100% of William's survivor benefits.  None

23   of the other individuals named as defendants in the interpleader action, including Emelda, has any

24   claim or interest in those benefits.  Further, Emelda's cross-claims against Dorothy should be

25   dismissed with prejudice.  In addition, the Court recommends that the Trustees' Default Judgment

26   Motions be GRANTED.   Rose Peter and Joyce Chapman have no claim or interest in William's

27

28                                                  33

survivor benefits and should be enjoined from commencing or maintaining any action against the Plaintiffs, the Pension Plan, the Welfare Plan, the Trustees of the Pension Plan or Welfare Plan, the ILWU, PMA, or the Plan's Offices regarding entitlement to the Survivor Pension benefits payable under the ILWU-PMA Pension Plan on account of William J. Peters, Jr.

The hearing before Magistrate Judge Spero scheduled for **July 31, 2009** on the Applications for Default Judgment is **vacated**.

Dated:  July 16, 2009

_____
JOSEPH C. SPERO
United States Magistrate Judge